IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| ESTECH SYSTEMS IP, LLC<br><br>    Plaintiff,<br><br>v.<br><br>MITEL NETWORKS, INC.,<br><br>    Defendant. | Case No. 2:21-cv-00473-JRG-RSP<br>(Lead Case) |

**DEFENDANT MITEL NETWORKS, INC.'S MOTION
TO EXCLUDE DR. RAMAMIRTHAM SUKUMAR**

Defendant Mitel Networks, Inc. ("Mitel") moves to exclude Estech Systems IP, LLC's ("Estech") survey expert, Dr. Ramamirtham Sukumar. First, Dr. Sukumar measures an irrelevant population of respondents—consumers of VoIP—so his survey results cannot be reliably applied to Mitel as a VoIP provider. Second, Dr. Sukumar's evidence is irrelevant to any issues of fact within this case and any marginally probative value is substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time. Both of these flaws are exacerbated because Dr. Sukumar did not deign to modify the survey he previously performed in cases (a) against VoIP consumers and (b) with different sets of asserted patent claims.

## I. BACKGROUND

### A. Stage of the Proceedings

On December 30, 2021, Estech filed this case against Mitel alleging infringement of U.S. Patent Nos. 7,123,699 (the "'699 Patent"), 7,068,684 (the "'684 Patent"), 8,391,298 (the "'298 Patent"), and 6,607,349 (the "'349 Patent"). *See* Complaint, ¶ 18. Subsequently, the Federal Circuit invalidated the applicable claims of the '298 Patent and the '349 Patent on *inter partes*

review. *See RingCentral, Inc. v. Estech Systems IP, LLC*, IPR2021-00572, paper 30 (Oct. 4, 2022) ('349 Patent) and *RingCentral, Inc. v. Estech Systems IP, LLC*, IPR2021-00574, paper 30 (Oct. 3, 2022) ('298 Patent). Accordingly, the remaining patents at issue in this case are the '699 Patent and the '684 Patent (together, the "Asserted Patents").

In early-April 2023, Estech's experts submitted their opening, burden-bearing reports regarding Mitel's alleged infringement of the Asserted Patents. With these reports, Estech submitted a repurposed report of survey expert Dr. Ramamirtham Sukumar, which addressed "customers' willingness to pay for features" of the '699 Patent, '684 Patent, '298 Patent, and '349 Patent. *See* Ex. 1 (Sukumar Report), ¶ 10. Dr. Sukumar's report purports to measure VoIP *consumer* preferences, without as much as mentioning (much less measuring) VoIP *provider* preferences.

In early-May 2023, Mitel submitted rebuttal expert reports, including the rebuttal report of Laura O'Laughlin, which addressed flaws in Dr. Sukumar's report, including his failure to tailor his conjoint survey to the correct population. *See generally* Ex. 2 (O'Laughlin Rebuttal Report), ¶ 71.

**B. Dr. Sukumar's Conjoint Survey**

Estech's counsel specifically retained Dr. Sukumar to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 (Sukumar Report), ¶ 10. He was tasked with determining ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* His methodology involved measuring the market value of the patented technology by estimating the value customers place on various features when choosing a Voice over IP ("VoIP") solution or service for their businesses, including ▮▮▮▮▮▮▮▮▮▮▮

2

███████████████████████████████████

███████████████████████████████████████████████ *Id.*

Dr. Sukumar performed a ████████████████████████████

████████████████████████████████████████████████████████ including: (i) quality of service during a VoIP call; (ii) VoIP solution for voicemail access and alert; (iii) voicemail system location; (iv) message caller ID association; (v) phone directory availability; (vi) call recording and voicemail backup; and (vii) total cost of VoIP ownership per month. *Id.* ¶ 12. The first attribute—quality of service during a VoIP call—purportedly corresponds to the '684 Patent, while the second and third attributes—VoIP solution for voicemail access and alert; and voicemail system location—purportedly correspond to the '699 Patent. *Id.* ¶ 25.

The sample population included ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ *Id.* ¶¶ 26, 38. The selected respondents first completed a portion of the survey regarding employment information, then completed a questionnaire regarding the brand of VoIP that the respondents were likely to purchase next, and lastly completed the Choice-Based-Conjoint exercise. *Id.* ¶¶ 30-31. During the Choice-Based Conjoint exercise, respondents were presented with fourteen choice sets, each with three VoIP options and a 'none' option, and asked ██████████████████████

██████████████████████████████████ *Id.* ¶ 36.

Using the results of his survey and applying Formula 14 thereto, Dr. Sukumar concluded that VoIP consumers are willing to pay ███ per user per month for the '684 Patent's █████████ feature; ███ per user per month for the '699 Patent's ███████████ █████████ feature; and ███ per user per month for the '699 Patent's ██████████

feature. *Id.* ¶ 50. But Dr. Sukumar never attempted to show (nor did he come to any conclusions about) the value of those features to a *VoIP vendor*, such as Mitel, since the report in the Mitel case was just a re-dated version of his prior, customer-defendant report.

## II.     LEGAL STANDARDS

The admissibility of expert evidence is governed by Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993). The trial courts serve a "gatekeeping role," and must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93, 597. Thereafter, the court should admit expert testimony only if it "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. Broadly, "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which the proponent offers it," including "if it is closely tied to the law and facts at issue in a given case." *U.S. v. Valencia*, 600 F.3d 389, 424-25 (5th Cir. 2010).

An expert's opinion must be "relevant to the task at hand." *Daubert*, 509 U.S. at 597. Under Federal Rule of Evidence 702(a), an expert's testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *Daubert*, 509 U.S. at 591. This requires the court to determine whether there is a sufficient "fit" between the expert's opinion and the facts of the case. Even where a qualified expert abides by reliable methodologies, if the opinion does not sufficiently bear on the specific issues at hand, it should be deemed irrelevant and inadmissible. *Daubert*, 509 U.S. at 591.

## III.     ARGUMENT

The Court should exclude Dr. Sukumar's testimony for two reasons: (1) his survey is unreliable because it measures the incorrect universe of respondents (i.e., consumers) and, therefore, cannot be reliably applied to providers, such as Mitel; and (2) his testimony is irrelevant because it does not sufficiently relate to any fact issues the jury will be asked to determine.

### A. Dr. Sukumar's Survey Measures the Incorrect Universe of Respondents and, Therefore, Cannot Yield Reliable Results Applicable to Mitel.

In the Fifth Circuit, the validity of an expert survey hinges, in part, on the "adequacy of the [survey] universe." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 506-07 (5th Cir. 1980). A proper "universe" should consist of respondents "whose characteristics or perceptions the survey is intended to represent." Ex. 2 (O'Laughlin Rebuttal Report), ¶ 72; *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) ("the persons interviewed must adequately represent the opinions which are relevant to the litigation."). For a survey to be valid, "the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp.*, 615 F.2d, at 264; *see also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004); *TravelPass Grp., LLC v. Ceasers Ent. Corp.*, No. 5:18-cv-153-RWS-CMC, 2021 WL 6334670, at *8 (E.D. Tex. Sept. 29, 2021).

Here, Dr. Sukumar's survey examined VoIP *consumers'* valuations of various VoIP product features based on data collected from respondents ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 1 (Sukumar Report), ¶ 26. The sample population was glaringly (and intentionally) devoid of respondents similarly situated to Mitel— namely, those involved in the design, manufacture, or sale of VoIP products. It logically follows that, because Dr. Sukumar's survey was crafted as a consumer valuation survey originally for a set of cases where the defendants were VoIP consumers, the results will only reflect the opinions of

5

VoIP consumers. It is not the opinions of VoIP *consumers* that are relevant to this case against Mitel, but the opinions of VoIP *providers*.

In *Amstar Corporation v. Domino's Pizza, Inc.*, an expert surveyed consumers of the alleged infringer's goods to determine likelihood of confusion between comparable marks, but neglected the primary demographic of consumers. 615 F.2d at 264. Consequently, the Fifth Circuit concluded that the trial court was in clear error for finding likelihood of confusion based on the survey results, and stated, "we do not believe that the proper universe was examined, and the results of the survey must therefore be discounted." *Id.* Dr. Sukumar's universe of respondents is even more egregiously flawed—he did not neglect the "primary" demographic at issue in the litigation, but the entire demographic of relevant respondents altogether. Even further, while the persons surveyed in *Amstar Corporation* inadequately represented the opinions *most* relevant to the litigation (i.e., the primary consumer demographic), the persons surveyed by Dr. Sukumar do not represent opinions relevant to the litigation *at all*. Dr. Sukumar's survey fails to meet the admissibility standards on its face because it fails to "adequately represent the opinions which are relevant to the litigation." *Id.*

Instead of trying to craft a survey that reflected a vendor's valuation, Dr. Sukumar specifically (and intentionally) leaned into the discrepancy by drafting the survey ▮▮▮▮▮ ▮▮▮▮▮ *See* Ex. 3 (Sukumar Deposition), at 26:5-26:9; *see also id.* at 31:20-32:2 (". . . ▮▮▮▮▮ ▮▮▮▮▮"); *id.* at 47:18-48:4 ▮▮▮▮▮ ▮▮▮▮▮).

He acknowledged the distinction between consumer decision-making processes and provider decision-making processes:



Ex. 3 (Sukumar Deposition), at 24:14-24:19.[1]

Unlike situations where a court may be left to wonder how such a glaring deficiency came to be, this Court has a very clear explanation: Dr. Sukumar submitted the exact same survey and testimony as that submitted in *Estech Systems, Inc. v. Carvana, LLC* without making, or even considering, any substantive modifications to adequately address the notable factual discrepancies between the two cases, all of which bear on the survey results and ultimate conclusions thereof. *See generally* Ex. 5 (Sukumar *Carvana* Report). Dr. Sukumar simply changed the caption and the date, and submitted the same report:



Ex. 3 (Sukumar Deposition), at 14:5-14:10. Dr. Sukumar also asserted that further modifications to his *Carvana* survey were ▮▮▮▮▮ for purposes of his report in this litigation. *See id.* at

---

[1] Notably, Mitel's own use (i.e., the one place it could be a stand-in for a "consumer") is not accused of infringement in this case. Ex. 4 (Occhiogrosso Dep. Tr. (Rough)), at 7:8-8:2.

16:16-16:20. While this alone does not make Dr. Sukumar's report unreliable, it helps contextualize why notable factual discrepancies that should have been addressed in Dr. Sukumar's report were absent, and gives this court a "why" for the lack of fit of Dr. Sukumar's opinions.

To say that the survey results accurately reflect a provider's valuation of the product features would be an unjustifiably extrapolated and unfounded conclusion from what may otherwise be an accepted premise regarding consumers' valuations. *See* Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments. More simply, it would be "akin to inserting a square peg into a round hole." *United States v. Mehanna*, 735 F.3d 32, 66 (1st Cir. 2014). Applying the results of Dr. Sukumar's consumer survey as corollary to a provider's valuation of the patented product features presents "too great an analytical gap between the data and the opinion proffered," and should be excluded. *Joiner*, 522 U.S. at 146. His opinions should be excluded in a trial with Mitel, a VoIP vendor.

**B. Dr. Sukumar's Testimony Is Irrelevant Because It Does Not Track The Patents-in-Suit as Related to Mitel[2]**

To be admissible under Rule 702 and *Daubert*, a consumer survey must sufficiently "measure how consumers value the purported advantages provided by Plaintiff's technology." *Fractus, S.A. v. Samsung*, No. 6:09-cv-203-LED-JDL, 2011 WL 7563820, at *1 (E.D. Tex. Apr. 29, 2011). A survey that only measures respondents' general preference for a feature risks improperly compensating the plaintiff for the unpatented features of the accused product where the survey is "not tied directly to" the patented technology. *Id.*

---

[2] Mitel acknowledges that the Court denied a similar Motion to Exclude Dr. R. Sukumar's Expert Report in *Carvana*, which was based on comparable grounds. *See* Ex. 10 (Order Denying Defendants' Motion (Dkt. 355)); *Estech Sys. IP, LLC v. Carvana*, No. 2:21-cv-00482-JRG-RSP, at *1 (5th Cir. 2021) (denying Defendants' Opposed Motion to Exclude Dr. R. Sukumar's Expert Report, Dkt. No. 215). Here, however, there are even greater deficiencies based primarily on the fact that Dr. Sukumar's attempts to tie his survey and the claim language are even attenuated here where there are different claims asserted against Mitel.

Dr. Sukumar's report identified the features and representative examples thereof that respondents were asked to evaluate. He asserted that the following features and examples correspond to the '699 Patent:



Ex. 6 (Sukumar Report Exhibits), at Exhibit 2. He asserted that the following features and examples correspond to the '684 Patent:

*Id.*

However, it is unclear how Dr. Sukumar established these categories. Dr. Sukumar has a background in marketing and statistics, not VoIP technology, and provided no further evidence showing that he is otherwise qualified to evaluate the technical aspects of this complex patented technology. *See* Ex. 1 (Sukumar Report), ¶¶ 1-9. Nor did he discuss these features with Estech's technical expert, Benedict Occhiogrosso. Ex. 3 (Sukumar Deposition), at 28:7-28:10 ("

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; *see generally* Ex. 4 (Occhiogrosso Deposition).  Indeed, he did not even bother to *look* at the specific claims within the respective patents.  Ex. 3 (Sukumar Deposition), at 32:4-32:14 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

Resultantly, Dr. Sukumar's survey addressed numerous elements of the various features that are wholly unrelated to the technology embodied by the '699 Patent.  First, because Estech did not invent voicemail or cellphones itself, the feature describing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is improperly attributed to the '699 Patent.  *See, e.g.*, *Fractus*, 2011 WL 7563820, at *1 ("The [expert] surveys attempt to quantify the estimated value of consumer preference for internal antennas in cell phones.  Plaintiff concedes that it did not invent, and the patents-in-suit do not cover, all internal cell phone antenna designs.").  Instead, the '699 Patent is directed only to a specific configuration for *streaming* voicemails stored on one LAN to another LAN by way of a WAN.  Second, the '699 Patent also does not require the centralized voicemail system that Dr. Sukumar purports.  Instead, claim 1 requires voicemail in a first LAN that can be *accessed* by a second LAN, not that all of an organization's voicemails must be stored in a central location.  Third, the '699 Patent also does not require a personal voice mailbox for each user, nor does it even mention "the cloud."  Instead, claim 1 requires a "user mail box connection message" that includes both "an extension associated with the telecommunications device *and* an identification of the voice mail box."  Ex. 7 ('699 Patent, claim 1).  And, as noted, Dr. Sukumar did not modify his survey at all to reflect the addition of claims 2 and 4 as asserted claims against Mitel.

Dr. Sukumar made similar errors regarding the technology embodied by the '684 Patent as well.  Notably, each asserted claim of the '684 Patent requires "a workstation coupled to the hub

10

through a telephone." Ex. 8 ('684 Patent, claims 29, 36, 37). However, as conceded in his *Carvana* deposition—which is equally applicable here given that Dr. Sukumar submitted an identical survey and report—Dr. Sukumar's ▬▬ of ▬ and ▬ quality of service failed to consider this requirement altogether. *See* Ex. 9 (Sukumar *Carvana* Deposition Excerpt), at 42:18-44:2 ("▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬"). This is further exacerbated by the relativity and subjectivity of these levels, as well as the undoubtedly negative association with the level ▬▬. *See* Ex. 2 (O'Laughlin Rebuttal Report) ¶¶ 54-55.

While the Court was previously uncompelled by this argument in *Carvana*, there is a larger gap between Dr. Sukumar's methodology and the facts of this case. Estech asserts ***different*** claims against Mitel, and Dr. Sukumar's testimony confirms that he did nothing to try to take those differences into account. Indeed, he did not conduct an updated survey, address those claims in his report, or even review those claims prior to submitting his report:

[redacted]

11

Ex. 3 (Sukumar Deposition), at 32:4-32:14.  As a result, Dr. Sukumar's survey questions **cannot** have taken into account the features recited in the claims at issue in this case.  Because Dr. Sukumar failed to tie the elements of the asserted claims (i.e., the patented technology) to the features covered in his survey, allowing Estech to rely on Dr. Sukumar's survey would risk the jury rendering a verdict based on survey questions that were fundamentally flawed, and render an attribution of value to patent claims impossible.

As the Court emphasized in its Order denying Defendants' motion in *Carvana*, the reasonable royalty estimation methodology need not be exactly tied to the facts of the case, but it must be "*sufficiently* tied to the facts of the case."  Ex. 10 (Order Denying Defendants' Motion, Dkt. No. 335), at 5 (citing *Summit 6 LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)).  The Court stated that "[t]he inquiry on the correctness of the methodology and the results produced in Dr. Sukumar's report can be properly explored through vigorous cross-examination and presentation of contrary evidence." *Id.* (citing *Daubert*, 509 U.S. at 596).

It is true that the correctness of Dr. Sukumar's methodology and the results of his conjoint survey **as applied to the claims in the Carvana case** may be assessed through cross-examinations and contrary evidence.  However, there is a reasonable chance that the claims Estech asserts at the Mitel trial do not overlap *at all* with the claims in the Carvana case, not least of which because each claim of the '684 Patent that was at issue in the Carvana case is on appeal after final rejection in *ex parte* reexamination.  Thus, there is substantial risk that Dr. Sukumar's report would hurt, rather than help, the ***Mitel*** jury.

Dr. Sukumar's survey and testimony are not relevant to Estech's claims in this case, lack a sufficient "fit" between the proffered conclusion and the facts of the case, and will not help the jury understand and evidence or determine a fact at issue. *Daubert*, 509 U.S. at 591, 597; Fed. R

12

Evid. 702(a).  Any marginal probative value is substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time.  Fed. R. Evid. 403.

## IV.     CONCLUSION

Estech's shortcut of re-submitting the same report should not be countenanced.  This Court should exclude his opinions under Federal Rules of Evidence 702 and/or 403 from the upcoming trial involving different claims for a different type of defendant than ever before.

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that all counsel of record who have appeared in this case are being served on this May 26, 2023 with a copy of the foregoing via the Court's CM/ECF system.

/s/ *Melissa R. Smith*
Melissa R. Smith

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7, counsel has complied with the meet and confer requirements on May 26, 2023.  The parties were unable to resolve the disputes presented in this motion and the motion is opposed.

/s/ *Melissa R. Smith*
Melissa R. Smith